UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:24CR261-MTS |
| | ) | |
| JOSE CORONEL-COSS, | ) | |
| | ) | |
| Defendant. | ) | |

# GUILTY PLEA AGREEMENT

Come now the parties and hereby agree as follows:

## 1. PARTIES

The parties are the defendant Jose Coronel-Coss, represented by defense counsel Raymond Bolourtchi, and the United States of America (hereinafter "Government"), represented by the Office of the United States Attorney for the Eastern District of Missouri. This agreement does not, and is not intended to, bind any governmental office or agency other than the United States Attorney for the Eastern District of Missouri. The Court is neither a party to nor bound by this agreement.

## 2. GUILTY PLEA

Pursuant to Rule 11(c)(1)(A), Federal Rules of Criminal Procedure, in exchange for the defendant's voluntary plea of guilty to Count 1 of the charge, the Government agrees to move for dismissal as to Counts 2 and 19 at the time of sentencing. The Government also agrees that no further federal prosecution will be brought in this District relative to the defendant's violations of

federal law, known to the United States at this time, arising out of the events set forth in this Indictment.

The parties agree that the recommendations contained herein fairly and accurately set forth some guidelines that may be applicable to this case. Further, based upon the facts of this case, the parties agree that the United States will cap its recommendation at sentencing to of 120 months, and the defendant will advocate for no less than 60 months, per the mandatory minimum of the charge.

The defendant also agrees, pursuant to the guilty plea to Count 1, to forfeit to the United States all property subject to forfeiture under the applicable statute(s)

**3. ELEMENTS**

As to Count 1, the defendant admits to knowingly violating Title 21, United States Code, Section 846, and admits there is a factual basis for the plea and further fully understands that the elements of the crime are:

1. At a time prior to the date of the indictment and including from March to December of 2023, the defendant and other persons did knowingly combine, conspire, agree, and confederate with each other with the intent to distribute and possess with the intent to distribute cocaine and methamphetamine; and
2. The defendant voluntarily and intentionally joined in the agreement or understanding, either at the time it was first reached or at some later time while it was still in effect; and
3. At the time the defendant joined in the agreement or understanding, he knew of the purpose; and

4. The amount of cocaine involved in the conspiracy attributable to the defendant is at least 500 grams.

**4. FACTS**

The parties agree that the facts in this case are as follows and that the Government would prove these facts beyond a reasonable doubt if the case were to go to trial. These facts may be considered as relevant conduct pursuant to Section 1B1.3:

Sometime in the past, starting an unknown time but prior to March 2023, in the Eastern District of Missouri and elsewhere, defendant Jose CORONEL-COSS conspired with others to distribute and possess with the intent to distribute controlled substances, including cocaine and methamphetamine, knowing the purpose of the agreement and conspiracy, and knowingly joined it while it was in effect.

Starting in January 2023, Drug Enforcement Administration (DEA) investigators began an investigation of drug distribution local to the St. Louis area. By continuing the investigation, investigators discovered a large-scale network of drug acquisition and distribution that spanned multiple states. During the investigation, investigators identified CORONEL-COSS as a manager of a St. Louis based faction of the drug trafficking organization (DTO) who was distributing cocaine and methamphetamine.

Based on the investigation, investigators obtained court-authorized Title III wiretaps for co-defendant Javier Ramos-Garcia's phone and listed to his drug related communications with other members of the DTO, including CORONEL-COSS. Throughout June and July, the two had numerous discussions about their separate factions of the drug organization and their complaints about their boss and source of supply (identified as co-defendant Genaro Rosas-Vargas). At

various points the two discuss Rosas-Vargas not being able to meet their drug supply needs and their desire to find a new source of supply. While the CORONEL-COSS and Ramos-Garcia managed separate factions of the DTO, based on their communications it is clear they worked together and provided each other drugs when the other one was out of supply.

For example, on June 28, 2023, investigators were conducting a controlled buy where an undercover (UC) investigator was going to meet Ramos-Garcia to purchase methamphetamine. After the deal was set up, investigators established surveillance of Ramos-Garcia and saw him meet with CORONEL-COSS in the parking lot of a Home Depot where Ramos-Garcia regularly conducted numerous drug exchanges. After the meeting was over, investigators continued surveillance of Ramos-Garcia as he drove directly to the arranged meeting location with the UC and provided the UC with approximately 442 grams of actual methamphetamine.

Based on surveillance and these communications, investigators also obtained court-authorized Title III wiretaps for CORONEL-COSS's phone and listened to his drug related communications with unknown individuals as well as co-defendant members of the DTO in CORONEL-COSS' faction, including co-defendants Allen Walker and Andres Tabima-Cordoba. During some of the calls, CORONEL-COSS is calling around to potential alternative sources of supply, trying to ensure he has enough product to provide for his faction of distributors and customers while coordinating and facilitating transactions. Many of the calls involve CORONEL-COSS facilitating pound and kilogram level transactions.

Specifically, on August 16, 2023, investigators began intercepting communications between CORONEL-COSS and Walker where the two used coded language to discuss meeting so

CORONEL-COSS could sell Walker four and a half ounces of cocaine. At the same time, CORONEL-COSS was also communicating with Tabima-Cordoba. During their conversations, Tabima-Cordoba used coded language to inform CORONEL-COSS that he could provide CORONEL-COSS with cocaine. The same day Tabima-Cordoba told CORONEL-COSS he could provide cocaine, investigators conducting surveillance saw Tabima-Cordoba meet with a man behind a restaurant for a few seconds and conduct and hand to hand transaction. The next day, August 17, CORONEL-COSS and Tabima-Cordoba continued to talk about meeting up and investigators continued conducting surveillance. During their surveillance they saw a Mercedes circle the area around Tabima-Cordoba's residence before parking in a nearby lot. Shortly thereafter, Tabima-Cordoba left his residence on a motorcycle and met with the driver of the Mercedes and conducted a hand-to-hand transaction.

The day after that, August 18, CORONEL-COSS and Walker communicated and agreed to meet at Walker's residence so CORNEL-COSS could provide the previously discussed four and a half ounces of cocaine. Investigators conducting surveillance of CORONEL-COSS observed him leave his home with a leather satchel, drive to Walker's residence, and go inside with the satchel before leaving a short time later.

A few days later a UC met with Ramos-Garcia and Ramos-Garcia told the UC he was driving to Texas to pick up 8-10 kilograms of cocaine. Investigators utilized precision location information in Ramos-Garcia's phone to track him on this trip down to Texas and his return to the St. Louis area. As Ramos-Garcia was driving back to St. Louis, he made several intercepted calls to individuals, getting ready to sell the cocaine he was bringing back. One of those calls was to CORONEL-COSS. During this same time frame, investigators intercepted communications

between CORONEL-COSS and co-defendant Josue Lopez-Delangel. During these conversations, CORONEL-COSS was arranging to sell Lopez-Delangel a large quantity of cocaine. Based on the totality of the communications, investigators believed CORONEL-COSS was planning to pick up cocaine from Ramos-Garcia as he returned to the St. Louis area and then distribute at least part of that pick-up to Lopez-Delangel.

On August 22, 2023, investigators conducting surveillance watched as CORONEL-COSS and Ramos-Garcia met in the parking lot of a business and conducted a hand-to-hand transaction. Immediately after the meeting with Ramos-Garcia, CORONEL-COSS drove directly to the home of co-defendant Steven Neira. Neira exited his home and got into CORONEL-COSS's vehicle. Investigators followed the vehicle until law enforcement conducted a traffic stop in St. Charles County. During the traffic stop a police canine positively alerted to the presence of the odor of narcotics and the vehicle was searched. During the search investigators found a Ritz crackers box containing approximately a half kilogram of cocaine under the front passenger seat, as well as a Craftsman tool bag containing four individual wrapped bags of cocaine in the rear hatch of the vehicle. Investigators also searched a brown satchel bag that was in the vehicle. That bag contained two medicine bottles that both contained cocaine and pills. In total, investigators seized approximately 664 grams of cocaine from the vehicle. When CORONEL-COSS and Neira were later interviewed, separately, they gave conflicting stories about what they were doing (Neira said the two were meeting socially to go bowling and CORONEL-COSS said the two were on their way to bid for a job).

Throughout the time that investigators were intercepting communications on CORONEL-COSS' phone, CORONEL-COSS regularly used coded language to discuss selling kilogram

quantities of drugs, similar to how he communicated with Lopez-Delangel prior to the August 22, 2023, traffic stop. Further, CORONEL-COSS often directed Neira to make deliveries of small amounts of cocaine to customers.

Based on the investigation, the parties agree that CORONEL-COSS is accountable for at least 3,000 kilograms but less than 10,000 kilograms of converted drug weight. The parties further agree that based on the evidence collected by investigators, including communications where CORONEL-COSS directing Neira to make deliveries, communications where CORONEL-COSS sets up and facilitates transactions, and CORONEL-COSS' direct link to high level broker Rosas-Vargas, that CORONEL-COSS' role was that of a manager. While the whole of the organization was extensive, CORONEL-COSS' leadership and management was of a small branch of the organization and involved less than five participants.

If this matter were to proceed to trial, the United States would likely call an expert witness to testify to specifics about the culture of drug distribution, the street prices of specific drugs, coded language when discussing drugs and distribution, and the fact that the amount of drugs possessed by and attributable to CORONEL-COSS is inconsistent with a user amount and instead consistent of amounts acquired for further distribution.

**5. STATUTORY PENALTIES**

The defendant fully understands that the maximum possible penalty provided by law for the crime to which the defendant is pleading guilty is imprisonment of not more than 40 years, a fine of not more than $5,000,000.00, or both such imprisonment and fine. The Court shall also impose a period of supervised release of not less than 4 years. **The defendant also fully**

**understands that the crime to which a guilty plea is being entered requires a mandatory minimum term of imprisonment of at least five years.**

**6. U.S. SENTENCING GUIDELINES (2024 MANUAL)**

The defendant understands that this offense is affected by the U.S. Sentencing Guidelines and the actual sentencing range is determined by both the Total Offense Level and the Criminal History Category. The parties agree that the following U.S. Sentencing Guidelines Total Offense Level provisions apply.

**a. Chapter 2 Offense Conduct:**

**(1) Base Offense Level:** The parties agree that the base offense level is 32, as found in Section 2D1.1. The parties agree that the quantity of converted drug weight for which the defendant is accountable, including relevant conduct, is at least 3,000 kilograms, but less than 10,000 kilograms, resulting in the agreed Base Offense Level.

**(2) Specific Offense Characteristics:** The parties agree that there are no Specific Offense Characteristics which apply.

**b. Chapter 3 Adjustments:**

**(1) Acceptance of Responsibility:** The parties recommend that two levels should be deducted pursuant to U.S.S.G. § 3E1.1(a) because Defendant has clearly demonstrated acceptance of responsibility. If this deduction is applied, and if Defendant is otherwise eligible, then the Government moves to deduct one additional level pursuant to U.S.S.G. § 3E1.1(b), because Defendant timely notified authorities of the intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. The parties agree that the defendant's eligibility for this deduction is based

upon information presently known. If the Government subsequently receives new evidence of statements or conduct by the defendant which it believes are inconsistent with defendant's eligibility for this deduction—including any violation of this agreement—the Government may present said evidence to the Court and argue that the defendant should not receive all or part of the deduction pursuant to Section 3E1.1 without violating the plea agreement.

**(2) __Aggravating Role__:** The parties agree that two levels should be added pursuant to Section 3B1.1(c) because the defendant's conduct has demonstrated he was a manager or supervisor of criminal activity that involved fewer than five people was not otherwise extensive, in that defendant operated a small faction of the drug trafficking organization.

**c. __Other Adjustment(s)/Disputed Adjustments__:** The parties have no further agreement regarding any other adjustments.

**d. __Estimated Total Offense Level__:** The parties estimate that the Total Offense Level is 31. Depending on the underlying offense and the defendant's criminal history, the defendant could be a Career Offender pursuant to Section 4B1.1. If the Court finds the defendant is a Career Offender, the Total Offense Level may be higher and the Criminal History Category may be as high as Category VI. The defendant has discussed these possibilities with defense counsel. Both parties reserve the right to argue that the defendant is or is not a Career.

**e. __Criminal History__:** The determination of the defendant's Criminal History Category shall be left to the Court. Either party may challenge, before and at sentencing, the finding of the Presentence Report as to the defendant's criminal history and the applicable category. The defendant's criminal history is known to the defendant and is substantially available in the Pretrial Services Report.

**f. <u>Effect of Parties' U.S. Sentencing Guidelines Analysis</u>:** The parties agree that the Court is not bound by the Guidelines analysis agreed to herein. The parties may not have foreseen all applicable Guidelines. The Court may, in its discretion, apply or not apply any Guideline despite the agreement herein, and the parties shall not be permitted to withdraw from the plea agreement. The Government recognizes it is bound by the specific agreements made herein but reserves the right to answer any questions the U.S. Probation Office or the Court might have related to sentencing or present evidence at the Court's request.

## 7. WAIVER OF APPEAL AND POST-CONVICTION RIGHTS

**a. <u>Appeal</u>:** The defendant has been fully apprised by defense counsel of the defendant's rights concerning appeal and fully understands the right to appeal the sentence under Title 18, United States Code, Section 3742.

**(1) <u>Non-Sentencing Issues</u>:** The parties waive all rights to appeal all non-jurisdictional, non-sentencing issues, including, but not limited to, any issues relating to pretrial motions, discovery and the guilty plea.

**(2) <u>Sentencing Issues</u>:** The parties agree to waive the right to appeal all sentencing issues, provided that the Court sentences the defendant to the parties' joint recommendation of between 60 and 120 months. Otherwise, the adversely affected party—the defendant if the sentence is higher, or the Government if the sentence is lower—reserves the right to appeal only sentencing issues related to: (1) application of Sentencing Guideline offense-level adjustments (including those based on criminal history) not specifically set forth in the plea agreement or non-application of adjustments specifically set forth in the agreement; (2) calculation of the defendant's criminal history category; or (3) substantive reasonableness.

**b. Habeas Corpus:** The defendant agrees to waive all rights to contest the conviction or sentence in any post-conviction proceeding, including one pursuant to Title 28, United States Code, Section 2255, except for claims of prosecutorial misconduct or ineffective assistance of counsel.

**c. Right to Records:** The defendant waives all rights, whether asserted directly or by a representative, to request from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including any records that may be sought under the Freedom of Information Act, Title 5, United States Code, Section 522, or the Privacy Act, Title 5, United States Code, Section 552(a).

**8. OTHER**

**a. Disclosures Required by the United States Probation Office:** The defendant agrees to truthfully complete and sign forms as required by the United States Probation Office prior to sentencing and consents to the release of these forms and any supporting documentation by the United States Probation Office to the Government.

**b. Civil or Administrative Actions not Barred; Effect on Other Government Agencies:** Nothing contained herein limits the rights and authority of the United States to take any civil, tax, immigration/deportation, or administrative action against the defendant.

**c. Supervised Release:** Pursuant to any supervised release term, the Court will impose standard conditions upon the defendant and may impose special conditions related to the crime defendant committed. These conditions will be restrictions on the defendant to which the defendant will be required to adhere. Violation of the conditions of supervised release resulting in revocation may require the defendant to serve a term of imprisonment equal to the length of the term of supervised release, but not greater than the term set forth in Title 18, United States Code, Section

3583(e)(3), without credit for the time served after release. The defendant understands that parole has been abolished.

**d. Mandatory Special Assessment:** Pursuant to Title 18, United States Code, Section 3013, the Court is required to impose a mandatory special assessment of $100 per count for a total of $100, which the defendant agrees to pay at the time of sentencing. Money paid by the defendant toward any restitution or fine imposed by the Court shall be first used to pay any unpaid mandatory special assessment.

**e. Possibility of Detention:** The defendant may be subject to immediate detention pursuant to the provisions of Title 18, United States Code, Section 3143.

**f. Fines and Costs of Incarceration and Supervision:** The Court may impose a fine, costs of incarceration and costs of supervision. The defendant agrees that any fine imposed by the Court will be due and payable immediately.

**g. Forfeiture:** The defendant knowingly and voluntarily waives any right, title, and interest in all items seized by law enforcement officials during the course of their investigation, whether or not they are subject to forfeiture, and agrees not to contest the vesting of title of such items in the United States. The defendant agrees to abandon his interest in all seized items and further agrees that said items may be disposed of or destroyed by law enforcement officials in any manner without further notice. By abandoning these items, the defendant waives any future rights to receive additional notice, a valuation of the items, or the opportunity to submit a claim to contest the disposition or destruction of the items that may exist under any policies or procedures of the seizing agency(ies).

The defendant agrees the stipulated facts above are sufficient to support forfeiture of certain assets pursuant to the applicable forfeiture authorities. The defendant consents that the Court may enter a consent preliminary order of forfeiture any time before sentencing, and such Order will become final as to the defendant when it is issued and will be part of the sentence. The defendant agrees not to object to any administrative, civil, or criminal forfeiture brought against any assets subject to forfeiture. The defendant will execute any documents and take all steps needed to transfer title or ownership of said assets to the Government and/or to rebut the claims of nominees and/or alleged third party owners. The defendant knowingly and intelligently waives all constitutional, statutory, and equitable challenges to any forfeiture carried out in accordance with this plea agreement, including but not limited to that defendant was not given adequate notice of forfeiture in the charging instrument.

**9. ACKNOWLEDGMENT AND WAIVER OF THE DEFENDANT'S RIGHTS**

In pleading guilty, the defendant acknowledges, fully understands and, hereby waives his rights, including but not limited to: the right to plead not guilty to the charges; the right to be tried by a jury in a public and speedy trial; the right to file pretrial motions, including motions to suppress or exclude evidence; the right at such trial to a presumption of innocence; the right to require the Government to prove the elements of the offenses charged against the defendant beyond a reasonable doubt; the right not to testify; the right not to present any evidence; the right to be protected from compelled self-incrimination; the right at trial to confront and cross-examine adverse witnesses; and the right to testify and present evidence and the right to compel the attendance of witnesses. The defendant further understands that by this guilty plea, the defendant expressly waives all the rights set forth in this paragraph.

The defendant fully understands that the defendant has the right to be represented by counsel, and if necessary, to have the Court appoint counsel at trial and at every other stage of the proceeding. The defendant's counsel has explained these rights and the consequences of the waiver of these rights. The defendant fully understands that, as a result of the guilty plea, no trial will, in fact, occur and that the only action remaining to be taken in this case is the imposition of the sentence.

The defendant is fully satisfied with the representation received from defense counsel. The defendant has reviewed the Government's evidence and discussed the Government's case and all possible defenses and defense witnesses with defense counsel. Defense counsel has completely and satisfactorily explored all areas which the defendant has requested relative to the Government's case and any defenses.

If the defendant is not a U.S. citizen, the guilty plea could impact the defendant's immigration status or result in deportation. In particular, if any crime to which the defendant is pleading guilty is an "aggravated felony" as defined by Title 8, United States Code, Section 1101(a)(43), removal or deportation is presumed mandatory. Defense counsel has advised the defendant of the possible immigration consequences, including deportation, resulting from the plea.

## 10. <u>VOLUNTARY NATURE OF THE GUILTY PLEA AND PLEA AGREEMENT</u>

This document constitutes the entire agreement between the defendant and the Government, and no other promises or inducements have been made, directly or indirectly, by any agent of the Government, including any Department of Justice attorney, concerning any plea to be entered in this case. In addition, the defendant states that no person has, directly or indirectly, threatened or coerced the defendant to do or refrain from doing anything in connection with any aspect of this case, including entering a plea of guilty.

The defendant acknowledges having voluntarily entered into both the plea agreement and the guilty plea. The defendant further acknowledges that this guilty plea is made of the defendant's own free will and that the defendant is, in fact, guilty.

## 11. CONSEQUENCES OF POST-PLEA MISCONDUCT

After pleading guilty and before sentencing, if the defendant commits any crime other than minor traffic offenses, violates any conditions of release that results in revocation, violates any term of this guilty-plea agreement, intentionally provides misleading, incomplete or untruthful information to the U.S. Probation Office, or fails to appear for sentencing, the Government, at its option, may be released from its obligations under this agreement. The Government may also, in its discretion, proceed with this agreement and may advocate for any sentencing position supported by the facts, including but not limited to obstruction of justice and denial of acceptance of responsibility.

## 12. NO RIGHT TO WITHDRAW GUILTY PLEA

Pursuant to Federal Rule of Criminal Procedure 11(c) and (d), the defendant understands that there will be no right to withdraw the plea entered under this agreement, except where the Court rejects those portions of the plea agreement which deal with charges the Government agrees to dismiss or not to bring.

5.5.2026
Date

Paul Rebar
Assistant United States Attorney

5/5/2026
Date

José Coronel
Jose Coronel-Coss
Defendant

5/5/2026
Date

Raymond Bolourtchi
Attorney for Defendant